No. 734 August 5, 2026 15

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHN CHARLES MOORE,
*Defendant-Appellant.*

Clatsop County Circuit Court
23CR17294; A184179

Kirk C. Wintermute, Judge.

Submitted December 8, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Rond Chananudech, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Deputy Attorney General, and Philip Thoennes, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

Defendant was convicted of one count of felony public indecency, ORS 163.465, for exposing his genitals to a teenaged girl in the yoga room of a public gym. The state's theory at trial was that the exposure was intentional and done for a sexual purpose, while the defense theory was that the complainant was mistaken about what she saw or that, if she did see something, it was an accidental exposure that occurred when defendant scratched himself to relieve itching from psoriasis. The case was tried to the court, which found defendant guilty of public indecency. Because of his criminal history, defendant was sentenced to life imprisonment without the possibility of release.

On appeal, defendant raises four assignments of error. He first claims that the trial court erred in overruling his objection to the prosecutor's statement in rebuttal closing argument that, if defendant's psoriasis was a factor in the exposure, defendant would have mentioned it when he spoke to a police officer about the incident. Defendant argues that that was an improper comment on his constitutional right to silence and that he should receive a new trial. The other three claims of error are in the alternative and pertain to sentencing. Defendant challenges the denial of his motion to exclude from consideration at sentencing three prior convictions that were entered on nonunanimous verdicts and, relatedly, the trial court's reliance on a presentence investigation report that included those convictions. And he contends that his true-life sentence is disproportionate in violation of Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United States Constitution.

We conclude that the trial court did not err in overruling defendant's objection during the prosecutor's rebuttal closing argument. Because defendant voluntarily spoke with the police about the incident, the prosecutor was permitted to point out inconsistencies between what he told the police and what he claimed at trial. We therefore affirm defendant's conviction. As for sentencing, the trial court relied little, if at all, on defendant's prior convictions entered on nonunanimous verdicts; however, to the extent the court considered them, it was not error to do so because those

convictions remain part of defendant's criminal history unless and until they are vacated through a post-conviction proceeding or otherwise removed from his record. Finally, although defendant's true-life sentence is obviously harsh—indeed, the harshest sentence available under Oregon law other than the death penalty—it is not unconstitutionally disproportionate as applied to defendant, given his criminal history.

## I.   FACTS

On April 12, 2023, a 16-year-old girl, L, and her male classmate, D, went to a public gym near their high school to stretch and work out in the gym's yoga room. The yoga room was small and had a mirror running along the wall. Defendant was also exercising in the yoga room. L recognized him from a prior gym visit. At one point, L saw defendant rubbing his groin in a way that made her uncomfortable and looked away. Less than five minutes later, she looked in the mirror and saw defendant in a plank position with both knees and one hand on the ground and the other hand holding his fully erect penis through the leg opening of his shorts. Defendant was looking straight at L in the mirror and appeared to be masturbating. L started crying and ran out of the room. D, who had been facing a different direction, turned and saw L run out of the room looking upset. Defendant was still in the room, and D saw him exercising; he did not see defendant's penis. L reported the situation to a gym employee, who called the police. The police arrived, and Patrol Sergeant Oya questioned defendant. Defendant, who was on post-prison supervision at the time, answered questions about the terms of his supervision and whether he was allowed to be at the gym. As to L's allegation, defendant denied exposing his penis, offered to leave the gym and not come back, and offered to take a polygraph examination. He did not mention having a medical condition or say that he had been scratching himself when L cried and left the yoga room.

Defendant was charged with one count of public indecency, ORS 163.465, and one count of endangering the welfare of a minor, ORS 163.575. He waived his right to a jury and was tried to the court. In opening statements, the

prosecutor laid out the basic facts of the case, and defense counsel explained that he would be calling two witnesses to testify that defendant suffers from psoriasis, which causes itchiness, because defendant "assumes he was just itching" when L saw him. The state proceeded to call L, D, and Oya, who testified as described above. After the state rested its case, defendant called two witnesses—his primary care physician and a staff member from his housing unit—who both testified that defendant has psoriasis, although neither knew whether it affected his groin area. The doctor explained that psoriasis can cause scaling and itching. Defendant did not testify.

In principal closing argument, the prosecutor walked through the details of L's testimony, particularly those indicating that the exposure was intentional and for a sexual purpose, and argued that the state had proved the charges. Defense counsel then argued that the case came down to reasonable doubt, particularly reasonable doubt as to whether defendant acted with a sexual purpose, and asked the court to find defendant not guilty. Defense counsel questioned certain aspects of L's testimony, such as suggesting that it was implausible that defendant held up his full body weight in a one-handed plank, and argued that defendant would not have stayed in the yoga room after L ran out if he had intentionally exposed himself to her. He also addressed defendant's demeanor and responses when questioned by police at the gym.

In rebuttal closing argument, the prosecutor clarified a few points of witness testimony, argued that it would have been easy for defendant to get his penis back into his shorts in the time it took for D to turn around, and then addressed the police interview. As relevant here, the prosecutor pointed out that defendant had not said anything to the police about psoriasis or itching and argued that "if that was really what happened," defendant would have said so "that day, not 10 months later." Defense counsel objected that "that's a comment on him exercising his right to remain silent," and, without hearing from the prosecutor, the trial court sustained the objection. The prosecutor tried to "rephrase" but basically said the same thing again,

arguing that "he didn't tell them that at the scene, that was not mentioned at all to the officers." Defense counsel again objected, stating that defendant was "under arrest" and "Mirandized" at the time and that the prosecutor's argument therefore amounted to a comment "on his exercising his right to remain silent at that time." The prosecutor responded, "But he didn't exercise his right to remain silent." The court overruled the objection on the basis that there was no evidence that defendant was in custody or had been given *Miranda* warnings, while noting that it would "give it the weight it deserves" and that defendant "has the right to remain silent, of course." The prosecutor resumed her rebuttal closing argument, turning her focus to the evidence that defendant acted with a sexual purpose, without further mention of the police interview.

After deliberating, the court found defendant guilty of public indecency and acquitted him of endangering the welfare of a minor.

Defendant's sentencing hearing took place two months later. At the hearing, defendant argued that the court should not consider some of his prior sex-offense convictions listed in the presentence investigation report because they were entered on nonunanimous jury verdicts. Specifically, the presentence report listed 12 prior convictions for sex crimes—a 1985 conviction for public indecency, a 1987 conviction for first-degree sexual abuse, a 1991 conviction for first-degree sexual abuse, a 1994 conviction for public indecency, and eight 1996 convictions for first-degree unlawful sexual penetration, first-degree rape, and first-degree sexual abuse—and defendant put forward evidence that three of the 1996 convictions were entered on nonunanimous verdicts. Defendant further argued that, regardless, it would be unconstitutional to impose the presumptive sentence of life imprisonment without the possibility of release (sometimes called "true life").

Regarding the 1996 convictions, the court found that three were based on nonunanimous verdicts and noted that, even if it did not consider those, there were still five other 1996 convictions (two for first-degree rape and three for first-degree sexual abuse) that were enough to get the

court into "that presumptive zone." The court continued, "So I don't discount that. I give it the weight I think it's due[.]" The court appears to have meant that it was not discounting the nonunanimity of the verdicts for those three convictions and was giving that fact the weight it considered appropriate.

The court then proceeded to explain why it was going to impose the presumptive sentence. The court acknowledged that the incident here was not the most egregious as public indecency goes and that, but for defendant's criminal history, it would be a misdemeanor. The court also stated that it would have a "really hard time imposing the presumptive sentence" in some circumstances, even with prior felony history. But the court felt that it did not have "any choice" but to impose the presumptive sentence in this case given defendant's extensive criminal history and "trail of victims." The court noted that defendant's criminal history included child sexual abuse, forcing himself on an adult girlfriend, and prior acts of public indecency. It also noted defendant's "complete lack of remorse or responsibility" for his crimes, which gave the court "real concerns." Ultimately, the court decided that there was no substantial reason to depart from the presumptive sentence. It therefore imposed the presumptive sentence of life imprisonment without the possibility of release.

## II.   THE PROSECUTOR'S ALLEGED COMMENT ON DEFENDANT'S EXERCISE OF THE RIGHT AGAINST SELF-INCRIMINATION

Defendant's first assignment of error is directed to the prosecutor's statement in rebuttal closing argument that, when questioned by police at the gym, defendant did not say anything about psoriasis or itching.

When the prosecutor first made that statement, defense counsel objected that it was "a comment on [defendant] exercising his right to remain silent," and the trial court sustained the objection without hearing from the prosecutor. When the prosecutor tried to rephrase but ended up saying the same thing again, defense counsel again objected, this time expounding that defendant was "under arrest" and "Mirandized" at the time and that the prosecutor's argument

amounted to an improper comment "on his exercising his right to remain silent at that time." The prosecutor responded, "But he didn't exercise his right to remain silent." The court overruled the objection, reasoning that the record was silent as to whether defendant was "in custody" or "Mirandized" at the time, although it noted in doing so that it would only "give it the weight it deserves" and that defendant "has the right to remain silent, of course." The prosecutor finished her rebuttal closing argument without saying anything further about defendant having not mentioned psoriasis or itching when questioned by police at the gym.

On appeal, defendant assigns error to the overruling of his second objection. He argues that the prosecutor's comment invited the factfinder (the court) to use defendant's silence as evidence of guilt, specifically by suggesting that an innocent person would have told the police about having psoriasis, whereas defendant did not. Defendant urges us to assume for purposes of our analysis that he had received *Miranda* warnings at the time of the police questioning, even though there was no testimony or other evidence admitted at trial on that issue.

The state counters that the trial court did not err in overruling defendant's objection, because the prosecutor was permitted to highlight inconsistencies between what defendant told police at the time of the incident and his later position at trial. Under the state's view, such inconsistencies are relevant in assessing the credibility of a late-raised innocent explanation for allegedly criminal conduct. The state agrees that it would be improper to cite a defendant's invocation of the right to silence as evidence of guilt, but it maintains that the prosecutor did not do so here. Alternatively, the state argues that, even if the prosecutor's statement was improper, it did not deny defendant a fair trial and therefore is not a basis for reversal.

The parties' arguments implicate important principles regarding when and how the "right to silence" may be invoked and when a prosecutor improperly comments on the exercise of that right. We therefore begin with a broad overview of the relevant case law on those issues, before returning to the facts of this specific case.

A.  *The Right Against Compelled Self-Incrimination*

Article I, section 12, of the Oregon Constitution provides that no person shall "be compelled in any criminal prosecution to testify against himself." Similarly, the Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."

Although often described as the "right to remain silent" or "right to silence," the actual constitutional right is against *compelled self-incrimination*. The "animating principle" of Article I, section 12, is "an aversion to compelled testimony." *State v. Davis*, 350 Or 440, 450, 256 P3d 1075 (2011). A criminal defendant cannot be compelled to testify at their own trial, at least without immunity. *State v. Soriano*, 68 Or App 642, 662, 684 P2d 1220, *aff'd*, 298 Or 392, 693 P2d 26 (1984). A witness cannot be compelled to answer incriminating questions on the stand. *State v. Rodriguez*, 301 Or App 404, 415, 456 P3d 312 (2019). And a person cannot be compelled to talk to the police and then have their statements used against them. *Davis*, 350 Or at 454-55.

The focus on compulsion is discussed at length in *Davis*, wherein the court analyzed the history and case law on Article I, section 12. *See id.* at 445-59. The court found "a complete absence of evidence of the recognition of a constitutionally protected 'right to remain silent' that exists independent of compelling circumstances." *Id.* at 453-54. As summarized in *Davis*:

> "[A]s a matter of textual analysis, the provision speaks to a right to be free from *compelled* self-incrimination; if there is a right to remain silent that is guaranteed by Article I, section 12, it is a right to insist that the police refrain from interrogation after a person who is in custody or otherwise in compelling circumstances has invoked the right to remain silent. That reading of the text is most likely what the framers of the Oregon Constitution would have understood Article I, section 12, to mean. The constitutional guarantee of a right against self-incrimination, as well as its common-law antecedents, were well and uniformly understood to prohibit only compelled self-incrimination. Moreover, this court has consistently construed the scope of the constitutional guarantee to apply only to questioning

while an individual is in custody or otherwise in compel-
ling circumstances."

*Id*. at 459-60 (emphasis in original); *see also id*. at 460
("Defendant does not explain how his assertion of a broader
'right to remain silent' independent of custody or other com-
pelling circumstances can be reconciled with the text of the
constitution, with its history, or with this court's case law.").

The Fifth Amendment right also is a right against
compelled self-incrimination. It protects a criminal defen-
dant from being compelled to testify at trial and, relatedly,
precludes prosecutors from commenting on the exercise of
that right. *Griffin v. California*, 380 US 609, 615, 85 S Ct
1229, 14 L Ed 2d 106 (1965). It also protects people from
being compelled to speak to the police while in custody.
*McNeil v. Wisconsin*, 501 US 171, 176-77, 111 S Ct 2204, 115
L Ed 2d 158 (1991). The United States Supreme Court has
"never held that a person can invoke his *Miranda* rights
anticipatorily, in a context other than custodial interroga-
tion[,]" and has noted that "[m]ost rights must be asserted
when the government seeks to take the action they protect
against." *McNeil*, 501 US at 182 n 3 (internal quotation
marks omitted).

The right against compelled self-incrimination is
therefore often described as "attaching" or "adhering" when
someone is taken into custody or placed in compelling cir-
cumstances. *E.g.*, *State v. Scott*, 343 Or 195, 201, 166 P3d
528 (2007) ("The state constitutional right against self-
incrimination and the derivative right to counsel adhere
when a suspect is subject to custodial interrogation."); *State
v. Rodriguez*, 339 Or App 267, 273, 568 P3d 202 (2025) ("The
right attaches when a person is in custody or a compel-
ling setting and subject to interrogation."); *see also State v.
Turnidge (S059155)*, 359 Or 364, 401, 374 P3d 853 (2016), *cert
den*, 580 US 1070 (2017) (absent compelling circumstances,
"the derivative right to counsel under Article I, section 12,
did not attach," and the police "were entitled to continue
to ask defendant possibly incriminating questions, as long
as they did not do so in a way that rendered his responses
involuntary"); *State v. Dodge*, 297 Or App 30, 32, 441 P3d
599, *rev den*, 365 Or 533 (2019) (the Article I, section 12,

right "attaches only when a person is in custody or other compelling circumstances").

Miranda warnings effectuate the right against compelled self-incrimination. *State v. Vondehn*, 348 Or 462, 474, 236 P3d 691 (2010). When a person is in custody or compelling circumstances, such that their Article I, section 12, and Fifth Amendment rights have attached, the police must give *Miranda* warnings to ensure that any subsequent waiver is knowing and voluntary. *Id.*; *see also State v. Reed*, 371 Or 478, 486, 538 P3d 195 (2023) (regarding compelling circumstances short of custody). The person must be told, in substance, that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 US 436, 479, 86 S Ct 1602, 16 L Ed 2d 694 (1966); *see Vondehn*, 348 Or at 474 (similar requirement under Article I, section 12). The *Miranda* warnings "serve to counteract 'the potentiality for compulsion' and ensure that, if an individual makes a statement during a custodial interrogation, the statement is 'the product of free choice.'" *Reed*, 371 Or at 485 (quoting *Miranda*, 384 US at 457).

If a person in custody or compelling circumstances is given *Miranda* warnings and makes a "knowing, intelligent, and voluntary" waiver, then the police may proceed to interrogate them, and the person's statements may be used against them at trial.[1] *State v. Nichols*, 361 Or 101, 107, 390 P3d 1001 (2017); *see also Miranda*, 384 US at 444 ("The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."). If a person initially waives but then changes their mind and invokes, Article I, section 12, is more protective than the Fifth Amendment as to what happens next. Under

---

[1] We note that it is arguably a misnomer to refer to a person "waiving" their rights under Article I, section 12, and the Fifth Amendment. A person might waive the right to "remain silent" by voluntarily agreeing to talk, but, as discussed, the right is really a right not to be *compelled* to talk, and, by "waiving" that right, the person is not agreeing to being compelled. To the contrary, they are making clear that they are *not* being compelled. Because the right is described in the *Miranda* warnings as a "right to remain silent," however, we speak in terms of "waiving" the right.

Article I, section 12, the police must stop the interrogation if the invocation is unequivocal, or pause for clarification if it is equivocal. *State v. Avila-Nava*, 356 Or 600, 609, 341 P3d 714 (2014); *see also Nichols*, 361 Or at 107 ("The state bears the initial burden of showing that a defendant charged with a crime validly waived the right; if the defendant initially waives the right, then the defendant bears the burden to show that he or she later invoked it."). By contrast, under the Fifth Amendment, the police must stop interrogation only upon an "unambiguous" invocation. *Berghuis v. Thompkins*, 560 US 370, 381-82, 130 S Ct 2250, 176 L Ed 2d 1098 (2010).

Absent a valid waiver, anything a person says while in custody or compelling circumstances is presumed to have been compelled. *See Miranda*, 384 US at 460-61 ("An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak."); *Vondehn*, 348 Or at 474 (describing custodial interrogation as "inherently compelling"). Statements that are deemed "compelled" will normally be suppressed at trial, along with any derivative physical evidence. *Vondehn*, 348 Or at 467.

Another way that the right against compelled self-incrimination is effectuated at trial is by keeping out of evidence the defendant's invocation or exercise of the right and by prohibiting improper comment on it. "[T]he Oregon Constitution does not permit a prosecutor to draw the jury's attention to a defendant's exercise of the right to remain silent[,]" and the United States Constitution similarly "prohibits a prosecutor from pointing out that a defendant has exercised his or her right to remain silent." *State v. Larson*, 325 Or 15, 22-23, 933 P2d 958 (1997); *see also Griffin*, 380 US at 614-15 (stating that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt," and describing comment on the refusal to testify as "a penalty imposed by courts for exercising a constitutional privilege" that "cuts down on the privilege by making its assertion costly"). It is "usually reversible error to admit evidence of the exercise by a defendant of the rights which

the constitution gives him if it is done in a context where-upon inferences prejudicial to the defendant are likely to be drawn by the jury." *State v. Smallwood*, 277 Or 503, 505-06, 561 P2d 600, *cert den*, 434 US 849 (1977).

Thus, if a defendant says nothing while in custody or compelling circumstances—or initially speaks but then invokes and remains silent thereafter—the prosecutor generally cannot use their invocation or silence as evidence of guilt or to impeach their trial testimony. For example, in *State v. Ragland*, 210 Or App 182, 190, 149 P3d 1254 (2006), where the defendant was arrested for driving under the influence of intoxicants (DUII) and given *Miranda* warnings, invoked her rights and remained silent, and then testified at trial to an innocent explanation for her breath-test results, it was improper for the prosecutor to comment on the defendant's post-arrest silence and suggest that, if what she said at trial was true, she would have said it to the police instead of remaining silent. In *State v. Mullenburg*, 112 Or App 518, 520-21, 829 P2d 98 (1992), where the defendant was arrested for DUII and given *Miranda* warnings, after which she refused to answer the officer's questions, it was improper for the prosecutor to comment on her silence. And, in *Doyle v. Ohio*, 426 US 610, 612-14, 618-20, 96 S Ct 2240, 49 L Ed 2d 91 (1976), where the defendant was arrested and given *Miranda* warnings, remained silent, and later testified at trial with an exculpatory story, it was improper for the prosecutor to ask the defendant why he had not protested his innocence to the police and told them the story he put forward at trial.[2]

It is permissible, however, to impeach a defendant at trial with prior inconsistent statements to the police, including statements made voluntarily while in custody or compelling circumstances. *See, e.g.*, *State v. House*, 282 Or App 371, 378, 385 P3d 1099 (2016) (under Article I, section 12, and the

---

[2] It should be noted that, under the federal constitution, it is a *due process* violation, rather than a Fifth Amendment violation, to use silence against a person who has been implicitly promised through *Miranda* warnings that their silence will not be used against them. *Doyle*, 426 US at 618; *see Wainwright v. Greenfield*, 474 US 284, 292, 106 S Ct 634, 88 L Ed 2d 623 (1986) ("The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony.").

Fifth Amendment, the state may impeach a defendant's trial testimony with prior inconsistent statements voluntarily made to the police); *Anderson v. Charles*, 447 US 404, 408, 100 S Ct 2180, 65 L Ed 2d 222 (1980) (the prosecutor may ask a testifying defendant about prior inconsistent statements voluntarily made to police because, "[a]s to the subject matter of his statements, the defendant has not remained silent at all"). For example, in *State v. Pickett*, 37 Or App 239, 243, 586 P2d 824 (1978), it did not violate Article I, section 12, or the Fifth Amendment for the prosecutor to explore discrepancies between the defendant's trial testimony and what she told the police after her arrest for shoplifting, because the defendant had waived her *Miranda* rights in speaking with the police, and "[t]here simply was no *silence* as to why she left the store without paying for the sweater." (Emphasis in original.)

A prosecutor also may impeach the defendant with inconsistencies in the nature of omissions, at least to some extent. If the defendant voluntarily spoke to the police on a particular subject while in custody or compelling circumstances, then testifies on the same subject at trial, the prosecutor may point out differences between the two versions, including things the defendant did not say to the police but later said at trial. *See Anderson*, 447 US at 409 (explaining that it does not violate the Fifth Amendment to question a defendant about something omitted from the prior rendition, because, while that could be viewed as a form of "silence," it is really in the nature of an inconsistent statement). And, in *State v. Attebery*, 39 Or App 141, 146-47, 591 P2d 409, *rev den*, 286 Or 449 (1979), where the defendant elicited evidence that he told the police after receiving *Miranda* warnings that he had an alibi, it was permissible for the prosecutor to elicit evidence that he had not provided any details to the police and suggest in closing argument that the claimed alibi was concocted. We distinguished a "case of talking" from "a case of refusal to talk" and reasoned that, when a defendant voluntarily speaks with the police, he cannot hide the facts surrounding what he said by asserting that he was exercising his right to silence as to the rest of the story.[3] *Id.* at 147.

---

[3] Our decisions in *House* and *Ashbaugh* should not be read as contrary. In *House*, we distinguished between affirmative statements and omissions in holding that, where the defendant testified that she smelled of alcohol when arrested

The final issue that we will address is how the foregoing principles do or do not apply when a person was *not* in custody or compelling circumstances.

When a person is *not* in custody or compelling circumstances, they do not need to be given *Miranda* warnings, the police are free to question them, and any statements voluntarily made are generally admissible at trial. *See, e.g.*, *Minnesota v. Murphy*, 465 US 420, 440, 104 S Ct 1136, 79 L Ed 2d 409 (1984) (no Fifth Amendment violation in admitting evidence of the defendant's confession to his probation officer, which was made voluntarily while not in custody and without *Miranda* warnings); *State v. Neal*, 73 Or App 816, 818 & n 1, 699 P2d 1171, *rev den*, 299 Or 663 (1985) (no impropriety in the prosecutor commenting on a statement that the defendant made "voluntarily, without compulsion," before his arrest). That is true even if a person prematurely invokes their rights before voluntarily speaking. *See State v. Anderson*, 285 Or App 355, 356-57, 396 P3d 984, *rev den*, 362 Or 94 (2017) (where the defendant was stopped for a traffic violation and immediately invoked her right to remain silent and her right to an attorney, the officer was nonetheless free to question her because she was not in custody or compelling circumstances, and the admission of her statements at trial did not violate Article I, section 12, or the Fifth Amendment).

It does not necessarily follow, however, that, if a person who is not in custody or compelling circumstances

---

for DUII because she had drank three nonalcoholic beers, it was improper for the prosecutor to try to impeach her by pointing out that she did not tell the police that on the night of her arrest. 282 Or App at 378. The defendant in *House* had invoked her rights multiple times, and the state did not dispute that her post-waiver omissions were "the product of [her] invocation of her constitutionally protected right to remain silent." *Id*. As for *Ashbaugh*, we held in that case that it was plain error under both Article I, section 12, and the Fifth Amendment for the prosecutor to comment on the defendant's silence when receiving a citation for theft. *State v. Ashbaugh*, 330 Or App 680, 686-88, 544 P3d 414, *rev den*, 372 Or 588 (2024). The defendant was given *Miranda* warnings, spoke to the officer, but then said nothing upon receiving the citation—he "didn't argue it" and "didn't seem upset that he was receiving a citation[,]" which the officer viewed as "kind of odd." *Id*. at 681-82. In closing argument, the prosecutor posited, "If that were me—you know how frustrated you would be to be falsely accused of theft? Instead, he sits there, doesn't say anything." *Id*. at 682. Noting that it was unclear whether the prosecutor was referring to the defendant's silence while receiving the citation or his silence in not testifying at trial, we concluded that either way it was plainly improper to point to his silence as evidence of guilt. *Id*. at 687.

refuses to speak or prematurely tries to invoke their rights before they attach, then their silence may be used against them at trial. In *State v. Schiller-Munneman*, 359 Or 808, 813, 377 P3d 554 (2016), the Oregon Supreme Court recognized an open question under both Article I, section 12, and the Fifth Amendment "whether, absent custody or compelling circumstances, a defendant's invocation of the right to silence in response to police questioning may be admitted as substantive evidence at trial."[4] *See also Salinas v. Texas*, 570 US 178, 183, 133 S Ct 2174, 186 L Ed 2d 376 (2013) ("We granted certiorari to resolve a division of authority in the lower courts over whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief. But because petitioner did not invoke the privilege during his interview, we find it unnecessary to reach that question." (Citations omitted.)).

As for using noncustodial silence for impeachment purposes, that is permissible under the federal constitution. *See Brecht v. Abrahamson*, 507 US 619, 628, 113 S Ct 1710, 123 L Ed 2d 353 (1993) (explaining that the "Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest, or after arrest if no *Miranda* warnings are given," because it is their potential reliance on the *Miranda* warnings that makes it a due process violation to comment on post-*Miranda* silence (citation omitted)); *see also Jenkins v. Anderson*, 447 US 231, 238-40,

---

[4] Long ago, in *State v. Mason*, 53 Or App 811, 819, 633 P2d 820 (1981), we stated, "It is clear *** that a person not in custody may assert his right to remain silent under the Fifth Amendment to the United States Constitution or to his right to counsel under the Sixth Amendment, even though he is not entitled to specific advice as to those rights. *Oregon v. Mathiason*, [429 US 492, 97 S Ct 711, 50 L Ed 714 (1977)]." Then, in *State v. Marple*, 98 Or App 662, 666 n 2, 780 P2d 772 (1989), we reiterated *Mason*'s statement regarding the Fifth Amendment and summarily added, "A person not in custody can also assert the right to remain silent under Article I, section 12." But *Mathiason* does not support the proposition for which it was cited in *Mason*—the defendant in *Mathiason* never invoked his right to remain silent, nor does the opinion discuss his ability to do so. *See Mathiason*, 429 US at 492-96 (holding that it did not violate the Fifth Amendment to admit the defendant's stationhouse confession, which he made without *Miranda* warnings, because the defendant was not in custody and was free to leave). Moreover, in *State v. Schiller-Munneman*, 270 Or App 22, 33, 346 P3d 636 (2015), *rev'd on other grounds*, 359 Or 808, 377 P3d 554 (2016), we suggested that *Marple* either had to be understood as a case involving a defendant in compelling circumstances or had to be seen as overruled by *Davis*.

100 S Ct 2124, 65 L Ed 2d 86 (1980) (holding that, where the defendant turned himself in to the police two weeks after killing someone and claimed self-defense for the first time at trial, it was permissible for the prosecutor to impeach the defendant's testimony by asking about his failure to remain at the scene to talk to the police and his delay in going to the police; doing so did not violate the Fifth Amendment because the defendant "cast aside his cloak of silence" by testifying and was subject to "the traditional truth-testing devices of the adversary process," nor did it violate due process under *Doyle* because the defendant was not induced into silence by *Miranda* warnings during the two-week period at issue (internal quotation marks omitted)). It appears to be an open question whether the same is true under Article I, section 12. *See Schiller-Munneman*, 359 Or at 812 & n 1 (noting that the issue is settled under federal law, and not citing any comparable Article I, section 12, case law).

In sum, a person may always choose to be silent or to limit what they say to a police officer. But not all "silence" implicates a person's constitutional rights under Article I, section 12, and the Fifth Amendment. Whether and how a person's silence—or failure to say something that they later rely on in court—may be used against them depends on the specific circumstances, including whether they were in custody or compelling circumstances at the time. We now return to the specific facts of this case.

B. *Application*

Defendant contends that the prosecutor improperly commented on his constitutional right to silence when she pointed out in rebuttal closing that defendant did not say anything to the police about psoriasis or itching and argued that he would have done so if that really was what happened, thus suggesting that he concocted that explanation for trial.[5] The state disagrees, asserting that it was permissible argument.

---

[5] Oya testified to his conversation with defendant at the gym, including stating that defendant did not mention having a medical condition or offer any explanation for what L saw. Defendant did not object to Oya's testimony and does not claim plain error in allowing that testimony. He challenges only the overruling of his objection during the prosecutor's rebuttal closing argument.

As previously described, defendant asks us to assume for purposes of our analysis that he was given *Miranda* warnings before talking to Oya—which we understand him to be using as shorthand to mean that he was in custody or compelling circumstances, received *Miranda* warnings, validly waived his rights, and then spoke to Oya.[6] When the trial court pointed out that there was no evidence on the *Miranda* issue, which the court viewed as dispositive, defendant did not respond. On appeal, defendant acknowledges the lack of evidence and points to an unsworn statement in the presentence investigation report indicating that he was "Mirandized" before talking to Oya.

Had defendant chosen to remain silent when questioned by Oya, then whether he was in custody or compelling circumstances and received *Miranda* warnings could be significant to the analysis. As described in the prior section, when a person in custody or compelling circumstances receives *Miranda* warnings and invokes or remains silent, that may not be used against them as substantive evidence, nor may the prosecutor comment upon it or draw attention to it. The law is less settled, however, regarding the extent to which a person's silence while *not* in custody or compelling circumstances may be used against them or commented on. That may be why defendant has put all his eggs in the basket of asking us to assume that he was in custody or compelling circumstances and given *Miranda* warnings before speaking with Oya.

Ultimately, however, we do not think it actually matters whether or not defendant was in custody or compelling circumstances when Oya questioned him, because, in either event, defendant did not invoke his rights or refuse to speak—he voluntarily talked. He talked about the terms of his supervision, denied exposing his penis, offered to leave the gym and not come back, and offered to take a polygraph examination. This case is therefore akin to cases like *Pickett* and *Attebery*.

---

[6] We emphasize that there has never been any suggestion of a *Miranda* violation in this case, *i.e.*, Oya questioning defendant in custody or compelling circumstances without giving *Miranda* warnings, or defendant not validly waiving his rights if he was given *Miranda* warnings.

In *Pickett*, the defendant voluntarily spoke with the police after her arrest for shoplifting, and "[t]here simply was no *silence* as to why she left the store without paying for the sweater." 37 Or App at 243 (emphasis in original). The prosecutor was therefore free to point out inconsistencies between what the defendant said at trial versus what she said to the police. *Id.* Similarly, we described *Attebery* as a "case of talking" rather than "a case of refusal to talk." 39 Or App at 147. The defendant in that case elicited trial testimony that he had told the police that he had an alibi for the night in question, thus suggesting that he was innocent and being hounded by police despite their knowing he had an alibi. *Id.* at 146-47. In response, the prosecutor elicited testimony that the defendant had not provided any details for his alleged alibi and, in closing argument, suggested that the alibi was concocted. *Id.* at 146. We affirmed the denial of a mistrial, explaining that the prosecutor could fairly comment on defendant's purported alibi because it was defendant who interjected the alibi issue into the case. *Id.* at 147.

Those cases involved defendants who talked to the police after being taken into custody and given *Miranda* warnings. Here, it is unknown whether defendant talked to Oya before or after he was taken into custody (or placed in compelling circumstances) and given *Miranda* warnings. But, if defendant was *not* in custody or compelling circumstances and had not yet been given *Miranda* warnings, that would only support a potential argument for *lesser* constitutional protections applying, based on the current case law as previously described. In relying on cases involving defendants who were in custody and had received *Miranda* warnings, we are essentially assuming *arguendo* that defendant was in that same position, which is the assumption he has requested.

Prosecutors are not limited to commenting on *direct* inconsistencies between what a defendant told the police and what the defendant says at trial. Information included in one version of the story but not the other is also a kind of inconsistency. *See id.* at 147 ("This is a case of talking claiming an alibi and then trying to influence the jury by showing the claim was made while at the same time hiding from the jury facts surrounding the making of the claim

which suggest it was false. We decline to turn *Doyle*'s shield into a sword."); *see also Anderson*, 447 US at 409 (inconsistencies include things omitted in one version of the story). Here, it was not improper for the prosecutor to point out that, when defendant spoke to the police at the gym, denied exposing his penis, and offered to take a polygraph, he did not mention having psoriasis or suggest that L might have seen him scratching himself. Nor was it improper for her to use that fact to argue that defendant would have mentioned that information to the police at the time if it was really what happened.[7] We reject the first assignment of error.

### III.   SENTENCING—CONSIDERATION OF ALL CONVICTIONS

In his second and third assignments of error, for which he presents a combined argument, defendant argues that the trial court erroneously denied his motion to exclude his nonunanimous convictions from consideration at sentencing and erroneously relied on a presentence report that contained those convictions. Defendant essentially argues that, once it was established that three of his 1996 convictions were entered on nonunanimous verdicts, the court could not consider those convictions for sentencing purposes. The state disagrees. It argues that defendant could not collaterally attack his prior convictions at the sentencing hearing, that the court did not rely on those convictions in any event, that defendant has not developed any meaningful argument on his third assignment of error, that the claim of error regarding the presentence report is unreviewable under ORS 137.079(5)(f), and that the trial court properly relied on the presentence report in any event.

We agree with the state that defendant could not collaterally attack his prior convictions during the sentencing

---

[7] It should be noted that defendant did not testify at trial, but, as described in his opening brief, the defense "theory of the case was that the teenager mistakenly believed that he was masturbating when she saw him scratch his groin area due to his psoriasis." Defendant put forward that theory through arguments by defense counsel, along with evidence that defendant does have psoriasis. Defendant has not made any issue of that distinction or put forward any argument for applying the law differently because of it. To be clear, the prosecutor did not comment in any way on defendant not testifying at trial (which would obviously be improper)—she commented only on the difference between what defendant told the police and his defense theory at trial.

hearing in this case—or at least that he has not developed any persuasive argument on that issue—and that the trial court therefore did not err in denying defendant's motion. For the same reason, the court did not err in considering the presentence report, which accurately described defendant's existing prior convictions. We need not reach and do not address the state's other arguments.

The validity of a conviction is a question of law. *See State v. Probst*, 339 Or 612, 628, 124 P3d 1237 (2005). Generally, "once final judgment in a criminal case is entered, its validity and regularity are presumed." *State v. Jacob*, 208 Or App 62, 67, 145 P3d 212 (2006), *aff'd*, 344 Or 181, 180 P3d 6 (2008). ORS 138.540 sets out the procedure for challenging a conviction outside the direct appeal process. After a defendant has exhausted their options on direct appeal, a petition for post-conviction relief is generally "the exclusive means * * * for challenging the lawfulness of such judgment or the proceedings upon which it is based." ORS 138.540(1). The Oregon Supreme Court has interpreted that to mean that "the legislature intended to prohibit other, collateral, challenges to such a judgment." *Jacob*, 344 Or at 188.

The rule is not without exception. A collateral attack on a prior conviction is permitted when the fact of a prior conviction allows for imposition of enhanced punishment on the current conviction and the statute provides a process for challenging the prior conviction. *Probst*, 339 Or at 625. Also, a prior conviction cannot be used to enhance the punishment on a later conviction if the record shows that the defendant was not represented by counsel and did not waive counsel in the prior proceeding. *Burgett v. Texas*, 389 US 109, 115, 88 S Ct 258, 19 L Ed 2d 319 (1967); *see Bailey v. Lampert*, 342 Or 321, 330 n 6, 153 P3d 95 (2007) (noting the federal constitutional exception and its contours). Defendant does not contend that an existing exception applies here, however, nor has he argued for extending the *Burgett* exception to convictions entered on nonunanimous jury verdicts.

Unless and until defendant obtains post-conviction relief that results in those three prior convictions being vacated, they remain on his record, and the trial court could consider them like any other conviction. That said, it is worth

noting that, in this case, the trial court expressed some trepidation about relying on them and suggested that it would not give them as much weight in considering defendant's criminal history. Indeed, it is possible that the court gave them no weight in the end, given its comments on the matter, but we cannot tell for certain, so we assume the court did consider them. That was not error, for the reasons stated.

## IV.   SENTENCING—CONSTITUTIONALITY OF TRUE-LIFE SENTENCE

In his fourth assignment of error, defendant contends that his sentence of true-life imprisonment is unconstitutionally disproportionate under Article I, section 16, and the Eighth Amendment. The state disagrees.

Article I, section 16, provides that "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." For a prison sentence to be cruel and unusual in duration, it "must be so proportioned to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." *State v. Rodriguez/Buck*, 347 Or 46, 57, 217 P3d 659 (2009) (quoting *Sustar v. County Court for Marion Co.*, 101 Or 657, 665, 201 P 445 (1921) (emphasis omitted)). The same standard applies to proportionality challenges. *Id.* It is important to keep in mind that a "sentence may be harsh without being unconstitutionally disproportionate." *State v. Lara-Vasquez*, 310 Or App 99, 110, 484 P3d 369, *rev den*, 368 Or 561 (2021). Given the legislative authority over punishments, only in "rare circumstances" should a penalty be deemed unconstitutionally disproportionate. *State v. Wheeler*, 343 Or 652, 671, 175 P3d 438 (2007).

"We review for legal error the trial court's conclusion that defendant's sentence was constitutional under Article I, section 16." *State v. Ryan*, 361 Or 602, 614-15, 396 P3d 867 (2017). In doing so, we are to consider at least three factors: (1) the severity of the penalty and the gravity of the offense; (2) the comparative penalties for other, related crimes; and (3) the defendant's criminal history. *Rodriguez/Buck*, 347 Or at 58. When a person is sentenced as a repeat

offender, however, as was the case here, the first and third factors, "in large part, coalesce," in that "we do not focus solely on the last offense that he committed in considering the gravity of the offense; we focus on the gravity of his criminal history." *State v. Althouse*, 359 Or 668, 686, 375 P3d 475 (2016). Also, the second factor plays a more limited role in evaluating a repeat-offender sentence, because "the various combinations of convictions that can give rise to an enhanced sentence can diminish the extent to which a comparison of the penalty for a single related offense will shed light on the proportionality analysis." *Id.* at 685-86.

In this case, defendant was convicted of public indecency for exposing his genitals to a 16-year-old girl in a public gym. He argues that life imprisonment without the possibility of release is an extraordinarily severe penalty for that offense. That is true—but it does not follow that it is unconstitutionally disproportionate.

There is no doubt that defendant's sentence is harsh. It is indeed the harshest sentence available under Oregon law other than the death penalty. And it is also fair to say that this particular offense falls on the less grave end, at least when viewed in isolation. The sentence would almost certainly shock the conscience if defendant were a first-time offender. But, as previously described, defendant has 10 prior convictions for hands-on sexual offenses (1987, 1991, and 1996) and two prior convictions for public indecency (1985 and 1994). Those convictions span from 1985, when defendant was 18 years old, through 1996, when defendant began serving a 321-month prison sentence for sex crimes. Defendant also has many prior convictions for non-sexual offenses—including criminal trespass, forgery, robbery, theft, giving false information, driving while suspended, reckless driving, possession of a controlled substance, and driving under the influence of intoxicants—as well as probation violations, a parole revocation, and disciplinary infractions while in custody. At the time of this incident, defendant had been out of prison for only seven months and was on post-prison supervision.

The legislature has made certain policy decisions relating to repeat offenders, including a policy judgment that,

if a person has been sentenced for felony sex crimes "at least two times prior to the current sentence," then the presumptive sentence for the current felony sex crime is true-life imprisonment. ORS 137.719(1); *see* ORS 137.719(3)(a) ("Sentences for two or more convictions that are imposed in the same sentencing proceeding are considered to be one sentence[.]"). The legislature also has made a policy judgment that public indecency is a qualifying "sex crime" for purposes of that repeat-offender statute. ORS 137.719(4) ("As used in this section, 'sex crime' has the meaning given that term in ORS 163A.005."); ORS 163A.005(5)(t) (defining "[s]ex crime" to include "[p]ublic indecency or private indecency, if the person has a prior conviction for a crime listed in this subsection").

       "It is not the role of this court to second-guess the legislature's determination of the penalty or range of penalties for a crime[,]" *Rodriguez/Buck*, 347 Or at 58, and it is only in "rare circumstances" that a punishment should be deemed unconstitutionally disproportionate, *Wheeler*, 343 Or at 671. It necessarily follows that, in most cases involving the application of ORS 137.719(1), a constitutional challenge will fail. We cannot say that this is one of those rare circumstances in which the presumptive sentence is unconstitutional as applied. Defendant has extensive criminal history, as discussed, and, at the time of this offense, was on supervision and had been out of prison only seven months. As discussed at length in *State v. Hernandez-Esteban*, 330 Or App 34, 45-57, 543 P3d 154 (2024), *rev'd on other grounds*, 374 Or 300, 577 P3d 761 (2025), a review of existing case law suggests that "a defendant's 'criminal history' is predominantly relevant to the proportionality analysis under Article I, section 16, as it pertains to incorrigibility and failure to deter." Here, unfortunately, defendant's criminal history suggests incorrigibility and a decided failure to deter.[8]

       We emphasize that the only issue before us is whether defendant's sentence is *unconstitutional*. Even when

_____

   [8] We focus our discussion on defendant's criminal history, because it is the key consideration in this case, as the trial court recognized. However, we have considered defendant's argument regarding the second *Rodriguez/Buck* factor and find it unpersuasive, both because of the limited role of the second factor when evaluating a repeat-offender sentence, *Althouse*, 359 Or at 685-86, and because defendant's argument is not really about "other, related crimes," *Rodriguez/Buck*, 347 Or at 58.

the presumptive sentence is not unconstitutional, there may be substantial and compelling reasons to depart, and the legislature has expressly allowed for that possibility. *See* ORS 137.719(2) ("The court may impose a sentence other than the presumptive sentence provided by subsection (1) of this section if the court imposes a departure sentence authorized by the rules of the Oregon Criminal Justice Commission based upon findings of substantial and compelling reasons."). Indeed, the legislative history suggests that, in enacting ORS 137.719, the legislature anticipated that *half* of all defendants sentenced as repeat felony sex offenders would be given departure sentences. *See* Budget Report and Measure Summary, Joint Committee on Ways and Means, SB 370, June, 23, 2001, at 3 (describing the presumptive sentence for repeat felony sex offenders, stating that a court may depart from the presumptive sentence if it finds substantial and compelling reasons, and explaining that "[t]he Criminal Justice Commission assumes that there will be 37 new convictions each year to which the presumptive life-without-release sentence could apply" and "assumes that life without release would be imposed in half of these cases, with departure sentences being imposed on the other half"). The trial court did not depart in this case, however, and the only issue before us is whether the sentence imposed was unconstitutional.

For the reasons explained, we agree with the trial court that, given defendant's criminal history, imposing a sentence of life imprisonment without the possibility of release did not violate Article I, section 16. Defendant has not developed any separate argument under the Eighth Amendment, so we reach the same conclusion under the Eighth Amendment. *See State v. Wiese*, 238 Or App 426, 429-30, 241 P3d 1210 (2010), *rev den*, 349 Or 654 (2011) (relying on the *Rodriguez/Buck* analysis to conclude that a sentence did not violate the Eighth Amendment, where the defendant did not develop a separate argument from Article I, section 16).

Affirmed.